May I please support James Muller for the appellant, Wayne Schulte. The primary issue presented in this case is whether there were exigent circumstances for the warrantless entry into Mr. Schulte's home. On April 7, 2005, Mr. Schulte answered his front door to find ten police officers confronting him. After some discussion, Mr. Schulte admitted that he was growing marijuana pursuant to a doctor's recommendation and that he believed he was legally doing so. Mr. Schulte's defense was that he did not have marijuana in his home. He did not have marijuana in his home.  I think it was 11-1. I'm not certain. 11-1 for what? For acquittal. But the record is that the prosecutor or the judge dismissed after this trial. So the question here is whether there was anything to indicate to the officers that there were exigent circumstances for them to enter the home without a warrant. Now, we have to put this into context. They brought the investigating officers, the appellee defendants, have brought eight other officers ready to search Mr. Schulte's home. They arrive at his home and ask him for consent. He refuses. At that point, there is a discussion at the door, which we believe was the officers attempting to gain a pretext to enter his home. Well, they said they smelled marijuana. Absolutely. Yeah. And they make a good argument that there's probable cause to believe there's marijuana. They don't really dispute that, though, do you? No, no. They make a good argument that there's probable cause to believe that there is marijuana growing in the home. The only thing we dispute is they've got to get a warrant. They can't sit there, ten officers outside his door, intimidating him, trying to get him to consent. And then when he doesn't consent, they can't then try to discover a pretext to enter his home. The district court didn't decide this on the basis of exigent circumstances. It decided it on the basis of the need for a protective sweep. Yes. I mean, protective sweep is one class. Why doesn't that just take care of the whole situation? Because even under a protective sweep, I mean, there's a certain comparison and borrowing of law between exigent circumstance and protective sweep. But even under a protective sweep, you have to have facts which indicate that there is someone inside the home. None of the cases, protective sweeps cases, where someone was arrested out of the home allow a search where there's no evidence. Could you account for their experience as narcotic officers? When they testified or they offered a declaration that usually in conjunction with growing marijuana, that there's multiple people involved. Well, that's their experience. What does that go for? I mean, you've got to give some credit to their experience. Sure. We'll give some credit. But if you look at their declarations, they said that the marijuana plants can't be left alone, which doesn't inherently strike me as real credible. But they weren't alone. Mr. Schulte was there. There was someone to care for the marijuana plants at that point. We didn't have any information that there was 24-hour necessity care for. But he was there anyway. So if they're going to say there's got to be someone with the marijuana plants at all times, Mr. Schulte is there. So they were right outside the door, right? They were right outside the door. Why couldn't they just quickly go in and check in whatever room the door enters into? I guess it's the living area. Yes. Why couldn't they just go in and check? Because that's a violation of the Fourth Amendment. You cannot. This guy, right, you know, they want to make sure they're concerned about their safety. Well, there are a lot of situations where police are worried about their safety, but they still have to follow the dictates of the Fourth Amendment. There were absolutely no ‑‑ if we look at all the cases before this, the only times protective sweep's been allowed when an individual is arrested outside his home is when there is some belief there's a drug selling conspiracy, that there are Confederates in the home, that there are noises in the home. And none of this was present here. This was just a gentleman who came out, freely admitted that he was growing marijuana pursuant to the Compassionate Use Act. And we have officers who wanted to get a peek, wanted to have something to bring to the judge for a search warrant affidavit. And that's what they did. They went into his home without complying with the dictates of the Fourth Amendment. And that's, I think, important. It's not just walking in. What case would have alerted these officers that to conduct either a protective sweep or regarding exigent circumstances would have informed a reasonably prudent officer that to go in this resident under those circumstances would have violated Schulte's Fourth Amendment rights? Well, I think they all would have, starting with Maryland v. Buey. But there is a specific case, U.S. v. Furrow, where it was a marijuana ‑‑ there was an arrest for marijuana possession of some kids. The officers came to the door of the house and asked if everybody would come outside. Everybody came outside. And at that point, they decided to conduct a protective sweep. The court, in finding that this was a violation, said that all the information was that everyone was outside the house, so there was no threat inside that house that they had to sweep for. And that's ‑‑ you know, we've got an even better case here. In Furrow, it was a party, so there were numerous people at that residence. Here, the only evidence they had was that Mr. Schulte was in his home alone. So there was no reason for a protective sweep. I mean, if this were allowed, this is an expansion. Did they know for sure that Schulte was the only guy there? Well, that's not the standard. The standard is did they have any facts to indicate that anyone was there at the time that they arrested Mr. Schulte? And they had nothing. They couldn't ‑‑ no one could know. Had they been surveilling him, and didn't they know that there were some females going in and out pretty regularly? They ‑‑ their declaration was that they had surveilled the house five or six times, and on some occasions, they had seen two females entering the house. There's no indication that these females, as to who they were, there's absolutely no indication that they have a name for these females or that they're involved in drug selling or even growing the marijuana. There's no indication that these females were, as to whether they were Mr. Schulte's girlfriend, mother, daughter. These are just two females. You know, this is a residence. More than one person. Was it a house or an apartment? It was a house. More than one person usually lives at a residence. So there was just nothing here for these officers to allow them to make this exigent circumstances sweep. And, you know, if they're allowed to do this, this is the kind of expansion of the protective sweep idea and the whole search incident to arrest idea that the Supreme Court recently rejected in Arizona v. Gantt. There had been argument that for any arrest outside an automobile, you should be allowed to search the automobile. The Supreme Court in Arizona v. Gantt said no. That's not the rule. We're not going to make that kind of bright line rule. Here we're faced with defendants, appellees, trying to extend the Maryland v. Buey protective sweep rule to the arrest of anyone outside his home, gives you exigent circumstances to make a protective sweep. I'm going to reserve the rest of my time. Thanks. Good morning, Your Honors. Glyve Bach on behalf of the City of Los Angeles and the individual officers. I'd like to point out that this is actually a qualified immunity case. So it's important here. That's my last theory. The question was directed at me. Okay. It's important that we view this through the prism of a reasonable officer. And I think that's what we're going to do. I think that what Judge Pais has brought out is very significant, which is that we had sort of two categories of items to look at here. One category are the specific facts that these officers had. When they're standing at the doorway of Schulte's house, they had seen these two individuals who had free access to his house. They could come in and out at will. Yeah, but they only saw him a few times. And their surveillance was short and sporadic. Isn't that right? That's true. Yeah. And someone had called in and complained that there was marijuana being grown there. And, you know, once they got to the door, and I don't know why they had to have ten officers there, but once they got to the door, well, with the door and the screen door, the door was open, the screen door was there, and they could smell the marijuana. They could smell the marijuana. Yeah, they could smell the marijuana. So at that point, they had probable cause. And they had sufficient evidence to ask for a search warrant, right? Correct. And they could have also obtained a telephonic warrant right there, right? Yeah, you can get telephonic warrants. Okay, I'm not. What? I think it is more common to do what they did. Well, sure, what they did was common, but you can get a telephonic warrant. Okay, well, because – That's one thing you can do. You know about telephonic warrants? I honestly don't, no. No, I know, because nobody uses them, because they get away with this kind of stuff. And, you know, all they had to do then, if it's marijuana, I don't think you can flush it down the toilet that easily. Well, but it wasn't – And so they had probable cause. They could have sent someone to prepare a search warrant. How far was this from the nearest courthouse? I'm not sure there's the courthouse in Northridge. But I'd like to point out – There's a courthouse up there, and they've got a lot of courthouses. Correct. In the Valley, you know, the Valley's got a million and three-quarters people. When I first got to the Valley, they didn't have any. They just had one up in San Fernando. They've got more judges and more courthouses than probably San Francisco and Oakland combined. So there are people there. They could have just staked out the house or gone around the back and just waited for a search warrant. And if they hear toilets flushing, they go in. But under a qualified immunity analysis, we don't look at it as what they could have done. We look at what they actually did do, and was that reasonable. And I think that here – I don't think it was reasonable. Well, okay. I mean, because there's a disrespect. There's a disrespect for the warrant requirement that's in both the state and the federal constitution. Okay. But they did all testify in their declarations that they knew that getting the warrant was going to be a process. They also knew not only – Was it what? It was going to be a process. It was going to take some time. And so what happened here, the lead investigating officer, Mejia,  he didn't have a warrant. He didn't have a warrant. He didn't feel that he necessarily even had that much on the case. He said, I wanted to close out my complaint. I wanted to close out this case. But it was as they approached his house, he testified to this in his statement. He brought 10 officers with him? He did not bring 10. That's incorrect. There were five officers total. So it was Officer Mejia, the lead investigating officer, and his supervisor, Officer Holtz, and there were three other officers. And that can be found at page 48 of the record. All right. So there were five officers. So that was his intent going up. But as he walked up, all three officers testified they experienced the overwhelming smell of marijuana. They also could see through the doorway that he had grog eyes. Did they say overwhelming? They did say that. They could also see through the doorway. The door was open, and they could see the grog eyes. So then by the time they got to the doorway, they realized this wasn't just a few plants. This was an entire grog operation. So that, coupled with the knowledge of these individuals who did have the free access to the house and Mr. Schulte, who was yelling very loudly at the front door, and the officers thought, rightly or wrongly, but reasonably. That he was signaling someone. He was signaling somebody inside. So while they did say, we will go get a warrant, and they did respect his request that he didn't consent to the search, they did do the protective suite slash exigent circumstances search. It's undisputed here that what they did was a very quick walkthrough. They didn't do any real significant search. They just walked through looking for individuals that could do the search.  Yes. And what was the exigency? The potential destruction of evidence while they're going to get the warrant. And also, secondarily, the issue of the officers. I'm sorry. Potential destruction of evidence. Correct. Was the exigency. Right. And also, coupled with that, the officer safety issue. How would the evidence be destructed? How would they destruct evidence? Well, in the hours it took to get the warrant. It doesn't take that long to get a warrant. In this case, it took about three hours. They went back to the police station. They had to draft up the warrant, present it to the judge, and that takes time. Don't they call the city attorney's office and tell them they need a warrant and give them the information? I, unfortunately, don't practice criminal law, but I believe that this is the way it's done. I think the police officers draft up their own declaration. They might have exemplars back at the office, but what they do is they draft it themselves, and that's part of the record in this case. Well, what inference could they draw from the two women that came there occasionally? That just simply that these women had such free access to the home, and I would also like to note that although counsel stated that there was nothing known about these women, not even their names, their names were known, and that can be found in the lead investigating officer's declaration at page 411. I'm sorry, they knew what about the women? Just their names. So they had investigated. It wasn't just a haphazard, oh, there's two women. They did look into it and find out their names, and he included that in his declaration. A little bit of them was. All right, they know the women can get into the house, so what does that tell you? Well, it didn't say that much when they were just surveying the house. It just showed two women that had free access. They could come and go freely without even knocking, so it was essentially their house, too. But when they got to the house and discovered that, in fact, this was an entire GROW operation and all the officers, I think two of the officers testified that with this extensive of an operation, it's not usually done just by one person. It's a group of people. And so, therefore, the officers reasonably believed, wait, those two women who had the free access, and if it's not those two women, it's probably somebody else because, in their experience as narcotics officers, these kind of operations are just not done by just one person. There's almost always somebody else involved. So they are believing, at the time they're on the doorstep, that somebody else is involved. In terms of alternatives, why couldn't one officer stay on the doorstep and the other at the back door? On the back door for what reason? Well, just to be sure that nobody came in while they were getting a warrant. To catch them as they run out the back door. They do it all the time. The record doesn't even talk about whether there was a back door. Anyway, why couldn't a couple of officers stayed around to be sure that nobody came in while they were getting a warrant? Well, that wouldn't guarantee, though, that nobody was already in the house. No. And, again, I think it's important to look at this as what it was. The women, they would just go in, and they weren't there that long, were they? They'd come out, but they weren't there whenever they... You know, the surveillance was not, like, continuously. It was intermittently. And sometimes they'd see women, sometimes they wouldn't. Sometimes the officers would just drive by just to check things out, to see what might turn up. Well, that's true, but they did, but on the times they were there, it's significant that they did keep seeing these same two women coming in and out. I think that this case is much more like the case that I cited, the Ala... I'm not going to be able to pronounce it right. Alamelo. In which, in that case, it's very similar. The police are observing, basically, a drug transaction going on in, essentially, a cul-de-sac, like a dead-end street. And this is the Alamelo, A-L-A-M-A-L-O. And what they see while they're basically surveying it and watching these guys bringing the drugs into the house, they see not anybody from the house leave, but somebody from the neighbor's house leave. And when they stop that guy, it turns out the guy they stop, who the court just describes as someone, turns out to be the brother of a neighbor. And based only on that, only on that, the court believed that that was reasonable for the police officers to suspect, oh, wait a minute, now this guy might be on his cell phone calling the suspects, alerting them that we're outside. That's a much more tangential connection than what we have here, where we actually have the women that they've seen going in and out. They've got the guy at his own house yelling, apparently alerting somebody. And so I think that the connection here is much stronger. If anything, that case would have instructed these officers that absolutely not only could they go in, they should go in. There was no surveillance that day, was there? Not shortly beforehand they did. Yes, they drove by, and they again saw the blocked-out windows. So just a quick drive-by? Correct. Did they park out there and, you know, slink down in their car and drink coffee and a hat, you know, really? Did they do that that day? I think really they were there just to go in and do a knock. Did they see any cars that parked in the driveway in front of the house? I believe there was a car, but I'm not sure. There's nothing in the record that I recall about seeing multiple cars. They're not going to come there with five police officers unless they mean business. Well, in these kind of situations, though, with narcotics, and this is what Officer Mejia testified to, is that you really need to have backup, even if it's just a backup. Oh, absolutely. No one's disputing that. No one's disputing that. And I think it was good that they went out and got a warrant, too. And I'd also just like to point out, finally, that the U.S. v. Furrow case that counsel talked about I think is very significantly different because in that case the suspect who had been taken out, it was a female at the party, actually had told the officers there's no one left inside. So if anything, the officers had been told, from their own observations, that the residence that they were going into had been cleared, whereas here they're going up to a house. They don't know who's in there. All they know is that there's a major operation. Who told them there was no one inside? In the Furrow case, which is what counsel is relying upon to say. Who was the person that told them? One of the females that was at the party who I believe lived in the residence. Lived there, huh? Right. So you think they really believed her? Well, it was that coupled with the fact that they had gone to the party and they had cleared out the people that were in there. Oh, the officers had gone in and cleared it out. They hadn't gone in, and that's where, in the U.S. v. Furrow case, the court found that they, that there were no exigent circumstances. But the point I'm making is I think it differs from this case, because in that case they actually had facts to believe that the residence had been cleared. Whereas here, we, the officers didn't have anything, in fact. To the contrary, they had indications that there were. Let me ask you, I have one last question for you. Let's just assume for a minute that we might disagree with you that there was, and we conclude that there was a constitutional violation. So in the qualified immunity analysis, you should go to the next step, which is whether the law was clearly established and whether the officer's conduct was reasonable in light of the fact that the law was not clearly established. So is it your position here that a reasonable officer at that time, under all these circumstances, would not have known that their conduct violated the Fourth Amendment? No. Yes, absolutely. And I think not. Why is that so? Well, because the law, I think it's true, as I said in my brief, that under exigent circumstances police can go in for their safety or to prevent the destruction of the evidence. The question here is whether or not it was reasonable for the officers to believe, under that state of the law, that evidence could be destroyed. And I think the factors that I talked about, not only the specific facts of the women and the extent of the operation, but also just the officers' experience, and they all talk about this in their declarations, is that in their experience as narcotics officers, other people are generally involved in these kind of experiments, in these kind of grow rooms. Also, that even if you're not selling, if you're just using, if you're growing this much marijuana, you usually have weapons in the house. That's what Officer Modlin testified to. He's doing it for medical purposes. Well, this actually is not a medical marijuana case because, first of all, the officers never saw his card. The card that's actually in evidence is not a valid card. It's simply a doctor's recommendation, first of all. Second of all, it's dated December 2005, which is after any of this took place. What he needed to have is a state-issued medical card. That is not what he had because that's not what's been offered in evidence. Okay. So it's actually not a medical marijuana case. It's a straight-up cultivation case. Thank you, Your Honor. Thank you. Thank you. First of all, there is a provision under the law allowing for the counties to issue cards. Los Angeles County has not issued any cards. The only way someone can claim medical marijuana is through a letter from a doctor, which is a recommendation to use marijuana. That's how medical marijuana is claimed in the county of Los Angeles. Addressing the qualified immunity, the burden is on the government to justify a warrantless entry, and there are well-delineated, according to the Murdoch case, exceptions to the warrant requirement. These are known by officers. They know that they need a warrant. So the law was clearly established at the time of this incident. A few other things that counsel mentioned. The names of the women, while it's not entirely significant. They did get a warrant. They did get a warrant, finally. They did get a warrant, and they were there, and they knew what was going on, and they just wanted to make sure. And they had this guy, Schulte. He was handcuffed for a while, so they had him, but they didn't know if there was anybody else in the house. And so they worried about that. Right. They got a warrant. Went through, and they checked things out. And then they went ahead and got a warrant. Right. And the warrant itself includes all the information they gained from this protective suite. It's my belief that they went in not realizing they probably already had probable cause to search, wanting to bring this information to the judge to ensure that they had probable cause. So I don't, you know. They had probable cause. Yes. And, but they did go get a warrant. They did. But they entered illegally initially. They didn't have exited circumstances. The whole destruction of the evidence thing is a red herring. Their position is they were concerned about their safety. Right. Well, they can be concerned about their safety, but they can't enter unless they have specific facts, which indicate that there's someone inside the residence which presents a danger to them. The case. Well, but they can base that on their past experience. Well, they can base it on their past experience, but it has to be combined with some facts. All the other cases have facts. Well, the facts you had here was there was marijuana being grown there. You had the blackout window, right? Right. And you had this strong smell. And. And you had the admission. And the admission, yeah. And so. Excuse me, Your Honor. Go ahead. I just wanted to make sure that there was no physical threat to them. Right. But all the cases say they have to have facts indicating that there are dangerous people inside the location. The case cited by counsel was a drug-selling conspiracy. All these protective suite cases have been drug-selling conspiracies. Here, the appellees admit that Mr. Schulte was not suspected of selling marijuana, merely growing it. And he admitted that. I mean, that's why the destruction of the evidence issue is a red herring. Mr. Schulte is freely admitting that he's growing marijuana. He is relying upon his belief that he's complying with the compassionate the Medical Marijuana Compassionate Use Act. So that's a red herring here. We have this is not the kind of situation where there's a methamphetamine lab with a bunch of. But at that time, he's in violation of Federal law. He is, but they. Yeah. Well, that's an issue as to what he's going to be prosecuted for, not about whether they're allowed to enter his home without a warrant. So in our position, the Fourth Amendment is clear. The case law is clear. You may only enter under certain circumstances. They didn't have those circumstances. All right. We've got it.
judges: Pregerson, Noonan, Paez